UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LJM FUND MANAGEMENT, LTD., <br><br> Plaintiff, <br><br> - against - <br><br> WELLS FARGO SECURITIES, LLC, <br><br> Defendant. | Civil Action No. 23-cv-7115 <br><br><br> **COMPLAINT** |

Plaintiff LJM Funds Management, Ltd., as agent for the LJM Preservation and Growth Fund, a series of Two Roads Shared Trust ("LJM" or the "Fund"), by and through its undersigned attorneys, as and for its complaint ("Complaint") against Defendant Wells Fargo Securities, LLC ("WFS"), alleges as follows.

## INTRODUCTION

1.     This case arises from devastating losses caused by breaches of contract by WFS, LJM's futures commission merchant ("FCM"), in connection with the abrupt and unlawful forced liquidation of the Fund's trading account at WFS, for which LJM served as investment advisor and agent.

2.     During an event on February 5, 2018, known as "Vol-mageddon"—an extraordinary but short-lived "Black Swan" event in the futures and options market—the Fund incurred significant, but temporary and unrealized, losses. In response, LJM planned to execute its well-conceived and tested plan to contain its temporary paper losses until the market normalized— which the market did, only hours later, by late morning on February 6, 2018. Instead, in breach of

the parties' FCM Agreement, before 7 a.m., WFS precipitously ordered an immediate liquidation of the Fund's entire portfolio, valued on February 2, 2018 at over $773 million.

3.      WFS was the only one of four FCMs used by Plaintiff and its affiliates to react in this manner. WFS recklessly took these extreme actions even though it knew of substantial risk-reducing trades that LJM executed on February 5th which—due to a backlog in the entry of executed trade orders—had not yet officially been cleared into LJM's account with WFS.

4.      At the time of the market event, LJM was in full compliance with the parties' FCM agreement and had posted all contractually required margin. Accordingly, WFS had no basis upon which to terminate the parties' FCM agreement on grounds of default.

5.      WFS thus premised its unlawful liquidation upon a provision in the FCM agreement entitling it to terminate the contract as of right. But on February 6, WFS did not transmit a written notice of termination to Plaintiff—necessary to effect a valid termination—and, indeed, did not do so until long after WFS had completely destroyed Plaintiff's business.

6.      In any case, under the FCM agreement, in such a termination as of right, LJM was entitled to at least two days to close out its open positions, as LJM saw fit, or transfer them to another FCM. In response to the Vol-mageddon event, LJM intended to pursue both avenues—closing out certain open positions in an orderly manner throughout the trading day while also requesting that one or more of its other FCMs take other portions of the account.

7.      But due to WFS' breach of the FCM agreement, LJM never got that chance. Abusing its practical control over LJM's portfolio, early on the morning of February 6th, WFS ordered and coerced the execution of a series of catastrophic trades—many made deliberately into illiquid and mispriced pre-opening markets—which locked in the Fund's primarily unrealized

losses and made them real. Worse, WFS' self-serving trading "strategy" vastly exacerbated the Fund's risks and losses.

8.     To ensure that LJM played ball on this suicide mission, WFS sent two minders to LJM's offices before the markets opened to peer over the shoulders of LJM's portfolio management team and enforce their compliance with WFS' instructions. LJM was forced to carry out these trades with "a gun to its head," upon the explicit threat that WFS would simply conduct the trades itself, through its own trading desk, at even more unfavorable prices.

9.     As a result of WFS' reckless actions—in clear breach of the FCM agreement and applicable industry law and regulations—the Fund sustained losses of approximately 81% of its portfolio value and was put entirely out of business. Plaintiff further lost the opportunity to exploit the market event to earn substantial profits on and after February 6, 2018, in the hundreds of millions of dollars.

## Parties

10.     Plaintiff LJM Funds Management, Ltd. is a corporation organized under the laws of the State of Illinois with a registered business address of One Financial Place, 440 South LaSalle Street, Suite 2301, Chicago, IL 60605.

11.     Defendant WFS is a Delaware limited liability company, with an address at 30 Hudson Yards, New York, NY 10001. The sole member of WFS is EVEREN Capital Corporation, a Delaware corporation with its principal place of business in North Carolina.

## Jurisdiction and Venue

12.     This Court has personal jurisdiction over WFS under the terms of a forum selection clause under which WFS specifically consented to personal jurisdiction in New York under New York General Obligations Law § 5-1401(1).

13.     The Court further has personal jurisdiction over WFS under NY CPLR § 302, among other things, because WFS (a) regularly does business, engages in a persistent course of conduct, and derives substantial revenue from services rendered in the state of New York; and (b) transacts business within the State of New York.

14.     WFS further affirmatively submitted itself to the jurisdiction of this Court under CPLR § 303 by filing the complaint against Plaintiff's affiliates in the related matter *Wells Fargo Securities, LLC v. LJM Investment Fund, LP and LJM Partners, Ltd.,* Civil Action No. 18-cv-02020, in the United States District Court for the Southern District of New York.

15.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1) because it is between citizens of different States, and the amount in controversy exceeds $75,000.

16.     Venue is proper in this district under 28 U.S. Code § 1391(b)(1) & (3).

### The Investment Advisory Agreements

17.     LJM Funds Management, Ltd. was formed in or about 2012 for the purpose of advising the Fund. On August 29, 2012, LJM and the Two Roads Shared Trust (the "Trust") entered into an Investment Advisory Agreement, under which the Trust appointed LJM as its investment advisor and agent for the management of the Fund. On November 10, 2015, LJM and the Trust entered into an Amended and Restated Investment Advisory Agreement, which reaffirmed LJM's role as investment advisor and agent for the management of the Fund. Pursuant to its authority under these agreements, LJM Funds Management, Ltd. entered into the FCM Agreement, described below, for the benefit of the Fund.

### LJM's Trading Strategy

18.     LJM's investment strategy involved the purchase and sale of options contracts on the S&P 500 futures index. LJM's objective was to deliver returns to investors that would be uncorrelated with the overall performance of the United States equity markets.

19.     The S&P 500 index is a commonly used and quoted index of large capitalization US stocks, often used to track overall performance of the United States equity market. It reflects the value of a basket of 500 commonly traded stocks, weighted by the capitalization of those stocks.

20.     The Chicago Mercantile Exchange ("CME") allows participants to trade S&P futures through contracts to buy or sell a specified future value of the index at a future date. For example, if the value of the S&P index is currently 3000, a futures contract could set a future value of 3100 for three months ahead, *i.e.*, for "delivery" in December 2019. Market participants choose to "buy" or "sell" the futures contract based on their views on the likely future course of the stock market—in particular, whether such participants think the market is likely to trade higher or lower than the specified future level of the index on the specified future date.

21.     The S&P futures contract is designed to be a cash market—*i.e.*, purchasers and sellers of the contract are not expected to buy or deliver the full basket of stocks in the S&P 500 but to make or receive payment in cash on the specified date for the equivalent value.

22.     A single S&P 500 futures contract on the CME is valued at 250 times the value of the S&P 500 index. The CME also offers an "E-MINI" futures contract ("E-MINI Futures"), which is similar to a regular futures contract, except it is 1/5 the size of the regular S&P futures contract (50 times the value of the S&P index). The smaller contract size makes the E-MINI Future a popular way to trade S&P futures.

23.     Market participants also can buy or sell call or put options on S&P futures contracts. A call option is the right to purchase an S&P futures contract at a specified price (the "strike price") at or before a specified future time (the "expiry date"). A put option is the right to sell the S&P futures contract at the strike price on or before an expiry date.

24.     An options contract—including an options contract on S&P futures—can be "in" or "out" of the money. An "in the money" option is an option that, if exercised today, would return a positive sum of money. An "out of the money" option is an option that, if were exercised today, would return zero or a negative return. The holder of an "out of the money" option can simply allow it to expire (and thus return zero). At any given time, an option holder can "lock in" existing gains or losses by exiting (selling out) of the position; alternatively, the holder can keep the option up until the expiry date.

25.     For its entire history, LJM exclusively traded options contracts on S&P 500 futures—with only two exceptions. An LJM affiliate twice conducted direct trades in E-MINI Future contracts in experimental proprietary accounts at another FCM, both times with negative outcomes. Those two experiences taught LJM that, in comparison with options, such direct trades were ineffective for balancing portfolio risk. Accordingly, LJM ceased trading in E-MINI Futures. For more than two years before February 6, 2018, no LJM affiliate made  trades in any way utilizing E-MINI Futures contracts. And the Fund never traded S&P 500 futures contracts of any kind during its entire existence.

26.     Most significantly, in the entire prior history of their relationship, neither the Fund nor any LJM affiliateever once traded E-MINI Futures in any account held with WFS.

**LJM's Risk Management Techniques**

27.     Like many hedge funds, LJM took both "long" and "short" option positions in its portfolio to hedge against market risk—*i.e.*, the risk that equity markets would rise or fall. In LJM's case, that meant purchasing and selling both calls (options to buy at a specified price) and puts (options to sell at a specified price).

28.     LJM managed the short option positions such that at any given time, they were "out the money"—that is, if the current market price of the underlying S&P 500 future remained the same as of the option expiry date, the option would expire without being exercised, or without payment being required by either side of the contract.

29.     Although the Fund's portfolio was not significantly affected by market risk, during periods of high volatility, the notional "paper" value of its portfolio could be temporarily affected During its existence, the Fund experienced several high volatility events. When such events occurred, the notional value of the portfolio temporarily declined, but LJM was able to implement effective risk management protocols to control risks and minimize actual losses from being realized.

30.     In particular, when volatility spiked, LJM would steadily close out positions over the course of the day, taking care to maintain the hedged nature of the portfolio—*i.e.,* balancing out its exit from both the "long" and "short" position in its portfolio. Because volatility events are often very brief—lasting only a matter of hours—LJM's protocol protected the capital of its portfolio while allowing for an orderly exit from trading positions if the event persisted.

31.     Over the course of its existence, LJM successfully implemented this risk management protocol on a number of occasions. For example, in August 2011, LJM experienced losses as a result of then record-breaking increases in the VIX volatility index, including a 50%

increase on August 8, 2011. The temporary paper losses ranged from 8.31% to 27.58%, but LJM later was able to fully recover from volatility related paper losses.

**LJM's FCM Agreement with WFS**

32.     In order to conduct its options trading on behalf of the Fund, pursuant to the authority granted to it as investment advisor, LJM entered into FCM agreement with WFS, dated March 31, 2015, under which WFS provided certain clearing and execution services (the "FCM Agreement"). The FCM Agreement was the sole contract under which WFS provided FCM services for the Fund. At all relevant times, WFS knew and understood that LJM was the duly authorized investment advisor and agent on behalf of the Fund, with full authority to execute all trades, receive and satisfy margin calls and take all other actions on behalf of and for the benefit of the Fund.

33.     Section 24 of the FCM Agreement provides that the contract is terminable at will upon formal written notice by either party. In the event of such a termination, LJM had the option of closing out open trades or transferring all open positions to another FCM, so long as either was done "promptly."

34.     The FCM Agreement does not include a definition of the word "promptly." However, the term "promptly" is a commonly understood term-of-art in the industry. Consistent with Rule 2-27 of the National Futures Association, the term "promptly" means the approximately two business days typically required to effectuate a transfer of accounts from one FCM to another.

35.     In the language and structure of the FCM Agreement, the parties clearly incorporated this standard industry meaning of the term "promptly" to establish the timeframe for LJM to effectuate the close out or transfer of open trading positions. The parties could not have intended "promptly" to mean "instantaneously" or "immediately," because that would render it

impossible, as a practical matter, for LJM to accomplish a transfer of positions to another FCM—a right which the FCM agreement specifically reserves. Similarly, if the term "promptly" were interpreted to require an instantaneous close out or transfer of all of the Fund's positions, any termination of the FCM Agreement, by either party—regardless of the circumstances—would result in a distress liquidation of LJM's portfolio. Neither of these commercially unreasonable outcomes, which would defeat the fundamental purpose of the contracts, were intended by either of the parties.

36.     Finally, while § 24 of the FCM Agreement requires LJM either to close out or transfer its open positions within approximately two business days of proper notice of termination, it does not confer upon WFS the right to direct LJM to conduct any specific trades to achieve that end. On the contrary, § 24 contemplates that LJM may execute trades of its own selection.

### LJM Faces the Vol-mageddon Event

37.     On February 5, 2018, the options markets experienced extreme and unusual instability, culminating by afternoon in a sudden unexplained spike in the "VIX," an index reflecting market volatility. Commentators referred to this extraordinary market event as "Volatility Black Monday" or "Vol-mageddon."

38.     At the time of the Vol-mageddon event, the Fund's portfolio consisted entirely of options positions on S&P 500 futures. The Fund's portfolio did not hold any direct positions—either long or short—in S&P 500 futures contracts, including in the E-MINI format.

39.     The extreme market event resulted in mark-to-market losses on the Fund's open options positions. However, these were primarily unrealized paper losses. In the course of the event, LJM traded actively to rebalance the Fund's portfolio and offset risk.

40.     Throughout the afternoon, following its usual protocol, LJM was able to execute risk reducing trades. However, in the afternoon, the spike in volatility overwhelmed the CME exchange. Due to excessive volume and failures at the CME (and its affiliated brokers), LJM's trades were not fully cleared by the executing brokers and were not reflected in official statements of LJM's accounts with WFS.

41.     At the close of trading on the afternoon of February 5, LJM detailed WFS on the numerous risk-reducing trades that had been executed but had not yet been cleared, which LJM had made to protect the Fund's portfolio. WFS knew, and acknowledged, that its own record of the accounts was incomplete and did not reflect the significant reduction of risk exposure accomplished that day.

42.     The Fund suffered significant unrealized losses on February 5. However, it was understood that the VIX spike was an anomalous and ephemeral event. If the markets stabilized and recovered—as they soon did, by mid-morning on February 6—LJM was well-positioned to recover the paper losses the Fund had suffered, and even to make a substantial profit. If the markets continued to deteriorate, LJM was in the best position to limit the scope of the losses by implementing its tried-and-tested risk management protocol for such events. Unfortunately, all those well laid plans went awry due to unlawful interference by WFS.

**WFS Violates the FCM Agreement and Inflicts Massive Losses on LJM**

43.     On the morning of February 6, WFS sent out a position statement and margin request for the Fund. Based on the positions that the Fund actually held after the close of trading on February 5, the Fund had more than sufficient funds available in its cash account at Union Bank to cover any margin requirements.

44.     WFS' statement and margin request was supposed to reflect the true state of the Fund's portfolio. However, as WFS knew and understood, its end of day position statement was inaccurate and failed to incorporate risk-reducing trades LJM made that afternoon. On the evening of February 5, WFS acknowledged that its statement was based upon incomplete and incorrect information, but nevertheless demanded excessive margin deposits from LJM.

45.     Under the terms of the FCM Agreement, the requested margin deposits were not due until the end of the same trading day—*i.e.*, close of business on February 6. Thus, on the morning of February 6, regardless of how the margin requirements were calculated, LJM was in full compliance with all of its obligations under the FCM Agreement.

46.     Nevertheless, at around 6 a.m., on February 6, 2018, well before markets opened, WFS contacted LJM by phone and stated that it was wholly terminating the parties' business relationship. Contrary to the terms of the FCM Agreement, which afforded LJM a full and fair opportunity to transfer or close out its positions in an orderly manner, WFS ordered LJM to liquidate its portfolios instantaneously. WFS put "a gun to the head" of LJM's portfolio managers, threatening that if LJM did not conduct an instantaneous liquidation, WFS would take over the account and do so itself, using its own blunt methods, which would be highly destructive to the value of the portfolio.

47.     After the call, WFS sent  formal written notices, at 7:36 a.m., expressly terminating its relationship with certain affiliates of the Fund, as of right, under § 24 of the FCM Agreement. The letters did not identify any purported "Event of Default" under § 19 of the Agreement or provide any other basis for the termination.

48.     Significantly, WFS did not send a similar written termination notice to Plaintiff LJM Funds Management, Ltd., on behalf of the Fund, as required under §24 of the FCM

Agreement. Thus, prior to ordering a complete liquidation of the Fund's account and destroying its business, WFS did not validly terminate its FCM Agreement with Plaintiff and the Fund.

49.     WFS took these precipitous actions although it knew they were based upon false and incomplete information concerning the content of the Fund's portfolio, and although WFS knew the true risk level in the portfolio already had been substantially reduced. None of the three other FCMs used by Plaintiff's affiliates—F.C. Stone, Bank of America/Merrill Lynch or RBC—similarly terminated their FCM agreements with Plaintiff's affiliates or ordered them to liquidate any positions.

50.     Because it had received no written termination letter, under § 24 of the FCM agreement, Plaintiff was under no legal obligation to close out or transfer its positions on February 6, 2018.

51.     Had it received such a termination letter, Plaintiff would have carried out its responsibilities under § 24 of the FCM Agreement. In particular, Plaintiff would have carried out its tested liquidation and risk management procedures to wind down the portfolio in a steady and orderly fashion, or else to transfer some or all of the positions to another, more reasonable FCM. Had Plaintiff been given sufficient time, it could have sought to transfer its position to one of its other brokers. Alternatively, left to its proper devices, as required under the contract, Plaintiff could have conducted an orderly exit from its options positions by the end of the trading day on February 7.

52.     However, WFS asserted that it was entitled to direct an immediate liquidation of all of the Fund's positions before the markets even opened, using trading mechanisms prescribed by WFS. Due these improper demands by WFS, in violation of § 24 of the Agreement, LJM never got that opportunity.

53.     WFS did not merely direct that LJM liquidate the Fund's existing, open options positions. Rather, WFS instructed LJM to conduct an immediate bulk "short" sale of E-MINI Futures. The Fund did not own or hold any "long" E-MINI Futures positions, or indeed any S&P futures positions, in its portfolio. Thus, WFS was giving the extraordinary direction to short sell futures positions that the Fund didn't own.

54.     WFS' order to short sell E-MINI Futures was not based upon a considered evaluation that such transactions were an appropriate way to unwind the Fund's portfolio. WFS account professionals did not know how to unwind the portfolio in an appropriate manner to control risk. They were, however, familiar with the common E-MINI Futures contract and knew that trades in that contract could be executed quickly and in large volumes. Thus, WFS professionals ordered LJM to conduct massive short sales of E-MINI Futures, even though they understood that the short sales would devastate the capital value of the Fund's portfolio.

55.     LJM never would have sold E-MINI Futures on its own accord. Indeed, the Fund had never traded E-MINI Futures in its entire eight-year history. LJM did so only under coercion with a gun to its head.

56.     Selling futures contracts directly (like E-MINI Futures) can be a way of offsetting put option positions of the sort held by LJM in part of its overall portfolio. But as LJM knew from painful experience, it was an extremely dangerous and unadvisable way to unwind an options portfolio like that held by LJM.

57.     Thus, trading E-MINI Futures before market open on February 6 reasonably would be expected to have a catastrophic effect. In the hours before the market opened, the relatively illiquid after-hours market had extreme and unusual spreads between futures and cash markets. Any experienced market professional, however, would have been aware of that price movements

in the after-hours market were not reliable sources of market information, given the highly illiquid trading conditions in that market.

58.     In this context, short selling S&P futures, without waiting for the market to open and adjust, would immediately realize and lock in massive unrealized paper losses from the prior day. At the same time, selling E-MINI Futures also would recklessly unbalance the portfolio— exposing the Fund to further brutal losses should the market correct and stabilize, which it did only hours later the same morning.

59.     Despite grave misgivings about the sale of E-MINI Futures, Plaintiff was forced to comply. WFS' message was loud and clear: if LJM did not carry out the E-MINI Futures trades, WFS would simply seize control of the portfolio and conduct the liquidating trades itself. In addition, WFS sent two minders to LJM's offices to oversee and report on LJM's compliance with WFS' instructions. The WFS employees arrived before market open and stayed through the end of the day, constantly monitoring and reporting on LJM's activities.

60.     LJM's fears concerning WFS' misguided prescription quickly were realized. The sale of E-MINI Futures resulted in massive losses to the portfolio, even before the options markets opened. In addition, the sale left the overall portfolio dangerously unbalanced. As explained above, in the ordinary course of business, LJM carefully hedged its book: it sold both put options (betting against a market fall) and call options (betting against a market rise). The rapid sale of E-MINI Futures had the effect of closing out the open put option positions, effectively locking in losses, while leaving the call option positions open and intact. This left LJM wholly exposed in the event that the markets stabilized or recovered, a typical development after an anomalous market move.

61.     Sure enough, by mid-morning that same day the market did stabilize and recover. By 11:00 a.m., WFS cleared LJM to cease trading E-MINI Futures. However, by then it was too

late—the put side of the Fund's book had been unwound, and the best that LJM could do was to attempt to limit the damage on the now completely unhedged portfolio. LJM had no choice at that point but to liquidate the rest of the Fund's portfolio.

62.     If the Fund had not been liquidated, but simply transferred the positions it had on the morning of February 6 to another FCM, instead of losing value, LJM's accounts would have been up by over 10%.

63.     Alternatively, if LJM was allowed to carry out its own portfolio wind down procedures, closing out or transferring certain positions in an orderly fashion, the Fund might have experienced some losses, but far less than those actually incurred, and indeed could have positioned itself for substantial gains.

64.     Instead, by the end of the trading day (3:15 p.m.), per WFS' orders, LJM had completely unwound the Fund with disastrous results, losing immediately losing 81% of its value—many times more than if LJM had been allowed to apply its trading procedures. Of these trading losses, approximately tens of millions  alone resulted from the E-MINI Futures trades directed by WFS.

65.     Had WFS not unlawfully coerced the Fund's liquidation, in breach of the FCM Agreement, not only would the Fund have mitigated its losses in the Vol-mageddon event but—consistent with its long history of weathering high volatility events—LJM would have had an opportunity to exploit the market event to earn substantial profits.

## COUNT I
### (Breach of Contract)

66.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

67.     WFS and Plaintiff executed the FCM Agreement, which is a valid contract.

68.     Plaintiff fully performed its obligations under the FCM Agreement.

69.     On February 6, 2018, WFS orally advised Plaintiff that it was terminating the FCM Agreement. However, WFS did not provide a written notice of termination and thus did not then validly terminate the contract under § 24 of the FCM Agreement.

70.     Because it was not properly terminated under § 24 of the FCM Agreement, Plaintiff was under no obligation to close out or transfer any of its positions.

71.     Even had the FCM Agreement with Plaintiff been properly terminated, under the termination clause in § 24 of the contract, Plaintiff was entitled either to "close out open positions in the Account" or to "arrange for such open positions to be transferred to another FCM."

72.     Instead of permitting Plaintiff to manage the liquidation of its own book in and orderly fashion or afford a reasonable opportunity to transfer its positions to another FCM, in breach of the FCM Agreement, WFS recklessly coerced Plaintiff at "gunpoint" into wholly liquidating the Fund's portfolio in a commercially unreasonable manner. WFS did so not by directing the sale of existing options positions, but by forcing immediate bulk short sales of futures that the Fund did not hold or own.

73.     In the absence of WFS' breach, Plaintiff would not have traded the Fund's portfolio as directed by WFS.

74.     The WFS liquidation and trades resulted in losses far greater than would have occurred had Plaintiff been allowed to manage the Fund's portfolio as set forth in the FCM agreement.

75.     Indeed, the WFS liquidation denied Plaintiff an opportunity to exploit the market event to earn substantial profits.

76.     By reason of the foregoing, on behalf of the Fund, Plaintiff is entitled to all of the Fund's damages resulting from the breach.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

77.     Plaintiff repeats and realleges the allegations above as if fully set forth herein.

78.     WFS and Plaintiff executed the FCM Agreement, which was a valid contract.

79.     Plaintiff fully performed its obligations under the FCM Agreement.

80.     On February 6, 2018, WFS orally advised Plaintiff that it was terminating the FCM Agreement with Plaintiff. However, WFS did not provide a written notice of termination and thus did not then validly terminate the contract under § 24 of the FCM Agreement.

81.     Because it was not properly terminated under § 24 of the FCM Agreement, Plaintiff was under no obligation to close out or transfer any of its positions.

82.     Even had the FCM Agreement with Plaintiff been properly terminated, under the termination clause in § 24 of the contract, Plaintiff was entitled either to "close out open positions in the Account" or to "arrange for such open positions to be transferred to another FCM."

83.     An implied term of the FCM Agreement was that, in the event of a termination as of right, Plaintiff was entitled to close out its books free from any coercion or undue influence by WFS that effectively would negate that bargained for contractual right.

84.     Instead of permitting Plaintiff to manage its own books, in breach of the FCM Agreement, WFS recklessly forced Plaintiff at "gunpoint" to liquidate the Fund in a commercially unreasonable manner.

85.     In the absence of WFS' breach, Plaintiff would not have traded the portfolio as directed by WFS.

86.     The WFS liquidation and trades resulted in losses far greater than would have occurred had Plaintiff been permitted to manage the Fund as set forth in the FCM Agreement.

87.     By reason of the foregoing, on behalf of the Fund, Plaintiff is entitled to all of its damages resulting from the breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pray that the Court:

    a)      Award Plaintiff its compensatory damages in an amount to be proved at trial;

    b)      Award Plaintiff all interest and costs and disbursements, including attorney's fees; and

    c)      Grant such other relief as it deems necessary and proper.

Dated: New York, New York
       August 11, 2023

               PRESS KORAL LLP

               By:___*/s/ Matthew J. Press*_____
                    Matthew J. Press
                    Jason M. Koral

               7 World Trade Center, 46th Floor
               New York, NY 10007
               Phone: (212) 922-1111